UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| FIN-AG, INC., | ) | CIV. 08-4141-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER DENYING |
| | ) | DEFENDANT NAU COUNTRY |
| NAU COUNTRY INSURANCE CO., | ) | INSURANCE COMPANY'S |
| STROUD NA, and | ) | MOTION TO DISMISS |
| JUDY ROOSA, d/b/a  ROOSA | ) | |
| AGENCY, | ) | |
| | ) | |
| Defendants. | ) | |

Fin-Ag, Inc. brought this declaratory judgment action against NAU
Country Insurance Co., Stroud NA, and Judy Roosa.  NAU moves to dismiss
the complaint.  Fin-Ag opposes the motion.  For the reasons stated below, the
motion is denied.

**FACTUAL BACKGROUND**

The facts, viewed in the light most favorable to Fin-Ag, are as follows:

Perle O'Daniel borrowed money from Fin-Ag to support his cattle
operation, and the loans were secured by O'Daniel's cattle.  To protect its
interest in the cattle, NAU required O'Daniel to maintain insurance coverage
over all risks, including theft, and required that the policy contain a lender loss
payable clause.  O'Daniel contacted Roosa to obtain an insurance policy and
notified her of NAU's requirements.  Roosa secured a policy with NAU.  Fin-Ag
was identified in the policy declarations as a "mortgagee with regard to the
cows and calves.

In 2001, O'Daniel moved some of his cattle to Midwest Feeders because he sold his ranch. He maintained ownership of the cattle, which were being housed, fed, and watered by Midwest Feeders. On September 11, 2002, O'Daniel discovered that some of his cattle had been stolen. That month, O'Daniel removed his cattle from Midwest Feeders' property. Ultimately, he determined that 334 cows, 369 calves, and 15 bulls were missing. Fin-Ag had a secured interest in all of the cattle that were stolen by Midwest Feeders.

O'Daniel notified NAU of the loss and submitted a claim to Roosa seeking reimbursement under the insurance policy. NAU denied coverage, citing a policy exclusion. The policy covered the theft of property, but it excluded from coverage the conversion of the cattle. Fin-Ag also notified NAU of its loss and submitted a claim, which NAU denied.

On May 21, 2003, O'Daniel filed a lawsuit against NAU seeking recovery under the insurance policy. See CV03-5045-AWB. The district court granted O'Daniel's motion for summary judgment and denied NAU's similar motion, determining that the insurance policy provided coverage for O'Daniel's loss. CV03-5045-AWB, Docket 52 (judgment for plaintiff). O'Daniel appealed to the Eighth Circuit Court of Appeals, which reversed and ordered that judgment be entered in favor of NAU. O'Daniel v. NAU Country Ins. Co., 427 F.3d 1058 (8th Cir. 2005). The Eighth Circuit determined that the policy explicitly excluded from coverage conversion of the cattle, found that the cattle were indeed converted by Midwest Feeders, and ordered that judgment be entered for NAU. Id. at 1060.

On October 11, 2005, O'Daniel filed a suit against NAU, Roosa, and Stroud. <u>See</u> CV05-5089-LLP. Ultimately, NAU was awarded summary judgment in its favor regarding all claims against it. CV05-5089-LLP Docket 39 (breach of contract and bad faith claims); Docket 82 (fraud and deceit, negligent misrepresentation, and negligent procurement). A jury trial was held on O'Daniel's claims against Roosa and Stroud, and the jury rendered a verdict in favor of O'Daniel in the amount of $519,525.

## MOTION TO DISMISS STANDARD

Rule 12(b)(6) requires the court to review only the pleadings to determine whether they state a claim upon which relief can be granted. In considering a motion to dismiss, the court assumes all facts alleged in the complaint are true, construes the complaint liberally in the light most favorable to the plaintiff, and should dismiss only if "it appears beyond a doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief." <u>Coleman v. Watt</u>, 40 F.3d 255, 258 (8th Cir. 1994). "The issue is not whether a claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974), <u>overruled on other grounds by</u> <u>Davis v. Scherer</u>, 468 U.S. 183, 191, 104 S. Ct. 3012, 3017, 82 L. Ed. 2d 139 (1984).

**DISCUSSION**

## I.     Evidence the Court May Consider

### A.     Insurance Contract

NAU requests that the court consider the content of the insurance policy between Fin-Ag and NAU.  Fin-Ag did not attach the insurance contract to any of its pleadings, and it argues against the court's consideration of the insurance contract at this stage, contending that such consideration would convert this motion to dismiss into a motion for summary judgment.

If "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  When such a conversion is made, the parties must be given a "reasonable opportunity" to present pertinent information.  Id.; see also Airframe Sys. Inc. v. Raytheon Co., 520 F. Supp. 2d 258, 262-63 (D. Mass. 2007).

> Most federal courts . . . have viewed the words "matters outside the pleading" as including any written or oral evidence introduced in support of or in opposition to the motion challenging the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings.  Memoranda of points and authorities as well as briefs and oral arguments in connection with the motion, however, are not considered matters outside the pleadings for purposes of conversion.  The same is true for various types of exhibits that are attached to the pleading, matters of which the district court can take judicial notice, and items of unquestioned authenticity that are referred to in the challenged pleading and are "central" or "integral" to the pleader's claim for relief.

5C Wright & Miller, <u>Federal Practice and Procedure</u> § 1366 (adopted by the Eighth Circuit in <u>Gibb v. Scott</u>, 958 F.2d 814, 816 (8th Cir. 1992)). Furthermore, in a case involving a contract, "the court may examine the contract documents in deciding a motion to dismiss." <u>Stahl v. U.S. Dep't of Agriculture</u>, 327 F.3d 697, 700 (8th Cir. 2003) (citations omitted); <u>Silver v. H&R Block, Inc.</u>, 105 F.3d 394, 397 (8th Cir. 1997) (stating that a plaintiff "cannot defeat a motion to dismiss by choosing not to attach" to the complaint documents on which it relies); <u>cf.</u> <u>BJC Health Sys. v. Columbia Cas. Co.</u>, 348 F.3d 685, 688 (8th Cir. 2003) (finding conversion to summary judgment motion when additional documents considered by the court "were neither undisputed nor the sole basis for BJC's complaint").

In light of the above authorities, the court believes that it can and should consider the insurance contract, and that doing so does not convert this motion to dismiss into a motion for summary judgment. The insurance contract is the sole basis for Fin-Ag's allegations against NAU, and the authenticity of the insurance contract submitted by NAU is undisputed. Because the insurance contract is an item "of unquestioned authenticity that [is] referred to in the challenged pleading and [is] 'central' or 'integral' to the pleader's claim for relief," the court will consider it in evaluating NAU's motion to dismiss.

5

### B.    Related Court Opinions

NAU also moves the court to take judicial notice of the published

opinions filed in the related case of <u>O'Daniel v. Stroud NA & Judy Roosa</u>, 05-

5089-LLP (O'Daniel II), found at 2007 WL 4568991 (D.S.D. Dec. 21, 2007) and

<u>O'Daniel v. NAU</u>, 427 F.3d 1058 (8th Cir. 2005) (O'Daniel I).

Federal Rule of Evidence 201 permits the court to take judicial notice of

adjudicative facts which are "not subject to reasonable dispute" because they

are "capable of accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b). A court "may

take judicial notice of a document filed in another court . . . to establish the

fact of such litigation and related filings."  <u>United States v. Jones</u>, 29 F.3d

1549, 1553 (11th Cir. 1994) (reversing district court's finding of judicial notice

with regard to facts included in the opinion); <u>see also</u> <u>Fridman v. City of New</u>

<u>York</u>, 183 F. Supp. 2d 642, 655 n.6 (S.D.N.Y. 2002).  The court opinions in

<u>O'Daniel I</u> and <u>O'Daniel II</u> are not in dispute and are "capable of accurate and

ready determination."  <u>See</u> Fed. R. Evid. 201(b).  Additionally, these court

records are necessary to determine the applicability of res judicata and

collateral estoppel.  Furthermore, Fin-Ag does not dispute the appropriateness

of taking judicial notice of these court opinions, other than to argue that

consideration of the opinions converts the motion into one for summary

judgment.  Docket 16, page 6.  As noted above, items that the court takes

judicial notice of do not convert the motion to dismiss into a motion for summary judgment. See Levy v. Ohl, 477 F.3d 988, 991 (8th Cir. 2007) (stating that in considering a motion to dismiss, a court is "not precluded in [its] review of the complaint from taking notice of items on the public record"). Accordingly, the court grants NAU's motion to take judicial notice of the court opinions in O'Daniel I and O'Daniel II.

## II.    Grounds for Dismissal

In its motion to dismiss, NAU contends that the insurance contract creates only derivative rights for Fin-Ag, such that Fin-Ag cannot maintain an independent action against NAU, as a matter of law. Docket 10, page 7-8. Even if Fin-Ag could maintain an independent action, however, NAU argues that the plain language of the policy precludes coverage. Id. at 8-10. Finally, NAU contends that Fin-Ag's claims of fraud and misrepresentation, negligent misrepresentation, deceit, negligent procurement, equitable estoppel, and revision/reformation of contract are barred under the doctrines of res judicata and collateral estoppel. Id. at 10-11.

### A.    Breach of Contract and Bad Faith Claims

#### 1.    The policy's standard mortgage clause confers on Fin-Ag an independent right to bring an action under the insurance contract

As its first ground to dismiss Fin-Ag's breach of contract and bad faith claims, NAU argues that the insurance contract provides only derivative rights

7

to Fin-Ag, a third-party beneficiary of O'Daniel, and that Fin-Ag does not have greater coverage under the contract than O'Daniel, the insured. NAU contends that because the Eighth Circuit has already stated that O'Daniel cannot collect under the terms of the contract, neither can Fin-Ag claim that the insurance policy provides coverage for its loss. In opposition, Fin-Ag argues that it has an independent right to sue under the policy.

The insurance contract discusses a mortgagee in two sections. First, the declarations page of the policy lists Fin-Ag as a mortgagee of O'Daniel's "cows and calves." Docket 9-2, page 2. Second, the policy discusses mortgagees at length in its "Mortgage, Secured Party, and Lender's Loss Payable Clause." Docket 9-3, page 24. The loss payable clause states:

> If a secured party is named on the "declarations", a loss payable on property subject to the security interest will be paid to the secured party and "you" as interests appear. If there is more than one security interest in the same property, the order of payment will be the same as their order of priority.

Id. The loss payable clause further states that if NAU denies the insured's claim,

> the denial does not apply to a valid claim of the mortgagee secured party, or lender if the mortgagee, secured party, or lender has:
> a.    notified [NAU] of change in ownership, occupancy, or substantial change in risk of which the mortgagee, secured party, or lender became aware;
> b.    paid the premium due under this policy on demand, if [insured] neglected to pay the premium; and
> c.    submitted a signed, sworn proof of loss within 60 days after receiving notice from [NAU] if [insured] failed to do so.

Id.  The loss payable clause also provides that if NAU cancels or does not renew the policy, it will notify the mortgagee at least ten days before such cancellation or nonrenewal takes effect.  Id.  Finally, the loss payable clause states that if NAU pays a mortgagee for a loss, the mortgagee's rights are subrogated to NAU with regard to the amount paid for the loss.  Id.

There are generally two types of loss payable clauses found in insurance contracts involving mortgagees such as Fin-Ag, and the difference is significant.  The first, the simple mortgage clause, or "open mortgage," "merely provides in effect that the proceeds of the policy shall be paid first to the mortgagee as his or her interest may appear[.]" 4 Couch on Insurance 3d § 65:8.  Therefore, the mortgagee is "simply an appointee to receive the insurance fund recoverable in case of loss to the extent of his or her interest, and his or her right of recovery is no greater than the right of the mortgagor." Id. at § 65:15 (citations omitted).  Such language is present in NAU's insurance policy, which provides for payment to a mortgagee "as interests appear." Docket 9-3, page 24.  Because the Eighth Circuit has held that O'Daniel has no right to recover under the contract, the existence of a simple mortgage clause would not confer on Fin-Ag any additional rights to sue.  See O'Daniel v. NAU Country Ins. Co., 427 F.3d 1058 (8th Cir. 2005).  Therefore, if the policy contains a simple mortgage clause, Fin-Ag's claims under the contract would appear to be barred.  See Northwestern Nat. Cas. Co. v. Khosa, Inc., 520

N.W.2d 771, 774 (Minn. Ct. App. 1994) (stating that the right of a mortgagee to recover under a simple mortgage clause "can be extinguished in situations where the named insured has no right to recover").

The second type of loss payable clause is a standard mortgage clause. A standard mortgage clause "is somewhat more specific, in that it also provides that the mortgagee shall be protected against loss from any act or neglect of the mortgagor or owner, so that it shall not defeat the insurance so far as the interest of the mortgagee is concerned." 4 Couch on Ins. 3d § 65:8; Id. at § 65:32 (stating that a mortgagor and mortgagee "have distinct and dissimilar rights where the policy contains such a standard union mortgage clause"). In South Dakota, standard mortgage clauses permit a mortgagee to "acquire[] separate rights under the contract and the law in the premises" as a "third party creditor-beneficiary" of the insurance contract. Union Cent. Life Ins. Co. of Cincinnati, Ohio v. Codington County Farmers Fire & Lightning Mut. Ins. Co., 287 N.W. 46, 48 (S.D. 1939). Thus, such a loss payable clause is intended to "supply the mortgagee with independent separate rights enforceable in his own name unaffected by defenses predicated upon acts of the mortgagor." Id.; see also White Motor Corp. v. Northland Ins. Co., 315 F. Supp. 689, 691-92 (D.S.D. 1970).

Fin-Ag contends that the insurance contract here contains a standard mortgage clause which confers upon it direct rights to coverage in the event of

its loss, despite NAU's defense to O'Daniel's claim. In response, NAU argues that South Dakota law would only recognize Fin-Ag, at the most, as a "mere third-party beneficiary loss-payee," whose claims would be defeated by the determination that O'Daniel was not covered under the policy. Docket 10, page 8. Such a reading of South Dakota law is inaccurate. See Union Cent., 287 N.W. at 46; White Motor Corp., 315 F. Supp. at 693. As stated above, while South Dakota courts have described a mortgagee's status under a standard mortgage clause as a "third party creditor-beneficiary" of the insurance contract, it has also stated that this status confers upon a mortgagee an independent right to sue under the contract, regardless of NAU's liability to O'Daniel. Union Cent., 287 N.W. at 46. For these reasons, if the court were to find that the insurance policy's loss payable clause is a standard mortgage clause, Fin-Ag may be able to assert its claims under the policy in spite of the resolution of the claims of mortgagor O'Daniel in NAU's favor.

The next question is whether the policy contains a standard mortgage clause, or merely a simple or "open" mortgage clause. The insurance policy at issue here lacks the typical language of a standard mortgage loss payable clause, namely, that the rights of the mortgagee are not invalidated by any act or neglect of the mortgagor. See Union Central, 287 N.W. at 46; 4 Couch on Ins. § 65:8. But the policy does contain language that appears to confer some additional rights in the mortgagee. Specifically, the policy states that denial of

11

the insured's claim "does not apply to a valid claim of the mortgagee secured party" if the mortgagee notifies NAU of (among other things) a "substantial change in risk of which the mortgagee . . . became aware," pays the premium due if insured fails to do so, and submits a proof of loss within 60 days. Docket 9-3, page 24. The policy also states that upon NAU's cancellation or nonrenewal of the policy, NAU will notify the mortgagee at least ten days before the date such action takes effect. Id.

Some authorities state that in an unclear case "a clause in a policy providing for payment of the proceeds to a mortgagee is construed as a standard mortgage clause rather than as a mere designation of a person to receive payment of a loss." 4 Couch on Ins. § 65:10 (citations omitted); see also Westhaven Group, LLC v. Auto-Owners Ins. Co., 2006 WL 2728649, *4 (N.D. Ohio Sept. 22, 2006). The rules of construction of a contract also support such an interpretation because ambiguities are construed against the drafter of a contract. See Opperman v. Heritage Mut. Ins. Co., 566 N.W.2d 487, 489 (S.D. 1997). For example, policy language "containing an open-mortgage clause not to cancel the policy without notice to the mortgagee, effects a contract of insurance directly with the latter, and is, in effect, a union [or standard] mortgage clause." 4 Couch on Ins. § 65:10. As stated above, NAU's policy contains a commitment to notify Fin-Ag ten days before termination of the contract. Docket 9-3, page 24.

12

Several courts have evaluated whether a standard mortgage clause is created when the policy includes language that denial of an insured's claim does not apply to the mortgagee's claim if the mortgagee fulfills some requirements related to notice and payment of the premiums. The language seen in NAU's policy seems to be very similar to language included in a loss-payable clause generated by the Insurance Services Offices, Inc. (ISO). Docket 9-3, page 24; see also Home Savings of Am. v. Continental Ins. Co., 104 Cal. Rptr. 2d 790, 796 (Cal. Ct. App. 2d 2001) (stating that the ISO policy provides that a change in risk will not defeat coverage for a mortgagee, "provided that the mortgagee notifies the insurer of any change of ownership, occupancy, or risk of which the mortgagee is aware"). A California court considering a similar insurance contract stated that such a clause is "substantially the same as the wording of typical standard clauses." Home Savings of Am. v. Continental Ins. Co., 104 Cal. Rptr. 2d at 797. Therefore, "[i]t would elevate form over substance" to read the provision stating that denial of the insured's claim "does not apply to a valid claim of the mortgagee" as anything but a standard mortgage clause merely because it does not include the precise wording such clauses have historically used. Id. at 796-97 (stating that "[s]o far as we are aware, every court to consider the matter has found the ISO-type clause to be a standard loss payable clause"). Courts around the country have agreed with the California court in finding that such language creates a standard mortgage

clause, such that the mortgagee is unaffected by the mortgagor's own inability to recover under the policy.  See Nationwide Ins. Co. v. Clark, 2006 WL 3694597, *4 (S.D. Miss. Dec. 13, 2006); Westhaven Group, 2006 WL 2728649 at *2 (stating that the "mortgagee's reciprocal promise to pay premiums in the event the policy holder does not . . . is one of the hallmarks of a standard mortgage clause"); Nationwide Mut. Ins. Co. v. Hunt, 488 S.E.2d 339, 343 (S.C. 1997); Jones v. Wesbanco Bank Parkersburg, 460 S.E.2d 627, 637 (W. Va. 1995); see also 4 Couch on Ins. § 65:76 (stating that the mortgagee's provision of notice and premium "constitutes valid consideration for an agreement that the interest of the mortgagee shall not be affected by any act or neglect of the mortgagor").

The South Dakota Supreme Court considered a similar situation over seventy years ago in Central Life Assurance Society v. Denver Mutual Fire Ins. Co., 256 N.W. 126 (S.D. 1934).  There an insurance policy stated that the mortgagee's interest in the policy's proceeds shall not be invalidated by the insured's failure to pay the premium, unless notice is given to mortgagee by insurer within ten days of non-payment.  Id. at 127.  Concluding that this additional language was insufficient to confer the rights reserved for a standard mortgage clause, the South Dakota Supreme Court stated that these additional words "simply make the 'open clause' a little more favorable to the insured than it otherwise would be.  We . . . do not believe that it translates this 'open

clause' into a mortgage clause with full contribution." Id. at 128. But unlike the case at hand, the Supreme Court in Central Life compared the policy language to standard forms of fire policy mandated by South Dakota statute before concluding that the additional language did not stray too far from the open mortgage language in the standard form policy. Id. (citing S.D. Rev. Code 1919 § 9199).

The present case is distinguishable from Central Life, however. In Central Life, 256 N.W. at 127-28, the South Dakota Supreme Court relied heavily on the fact that the policy language hewed closely to the "open clause" specified by South Dakota statute when it found that no standard mortgage clause had been created. Almost eighty years later, the South Dakota statutes no longer mandate standard provisions applicable to this type of insurance. Furthermore, the policy language in Central Life did not include the provisions of the policy at issue here, namely that denial of the insured's claim does not apply to a valid claim of the mortgagee secured party if the mortgagee notifies the insuror of a substantial change in risk of which the mortgagee becomes aware, pays the premiums due, and submits proof of loss. Other courts have found that similar language is sufficient to confer rights upon a mortgagee that are independent of the mortgagor/insured. See Hunt, 488 S.E.2d at 343 (stating that such language that the mortgagee's claim is not extinguished

when as long as the mortgagee provides notice and payment "is substantially the same as the wording of typical standard clauses").

For these reasons, the court concludes that the insurance policy contains a standard mortgage clause, which, under South Dakota law, renders Fin-Ag able to assert the "independent separate rights enforceable in [its] own name unaffected by defenses predicated upon acts of the mortgagor," O'Daniel. See Union Cent., 287 N.W. at 49.

**2. Factual questions remain as to whether Fin-Ag fulfilled the preconditions to recover**

Because the court has determined that the policy includes a standard mortgage clause conferring independent rights upon Fin-Ag as a mortgagee, it must evaluate whether Fin-Ag's conduct in securing those rights presents a factual question outside of the scope of a motion to dismiss.

The policy's standard mortgage loss payable clause discusses the mortgagee's entitlement to recovery despite the denial of coverage to the mortgagor. That provision states:

> If "we" deny "your" claim, that denial does not apply to a valid claim of the mortgagee . . . if the mortgagee . . . has:
> a.    notified "us" of change in ownership, occupancy, or substantial change in risk of which the mortgagee . . . became aware;
> b.    paid the premium due under this policy on demand if "you" neglected to pay the premium; and
> c.    submitted a signed, sworn proof of loss within 60 days after receiving notice from "us" if "you" failed to do so.

Docket 9-3, page 24.  Such a provision in a standard mortgage clause

serves as a condition to mortgagee's rights under the contract.  Ormsby v.

Phenix Ins. Co. of Brooklyn, 58 N.W. 301 (S.D. 1894).  Examining a very

similar provision, the South Dakota Supreme Court in Ormsby stated:

> The legal effect of the mortgage clause is that the defendant,
> upon a valid consideration, agrees to pay the loss, if any,
> directly to the mortgagees, and they are by the agreement
> recognized as a distinct party in interest *so long as they comply
> with the terms of the mortgage clause agreement*. . . . In this case
> . . . the clause in the mortgage contract that the insurance as to
> the interest of the mortgagee should not be invalidated by any
> act or neglect of the mortgagor . . . ceases to be operative
> whenever there is a change of ownership or an increase of
> hazard that comes to the knowledge of such mortgagee, and he
> fails or neglects to give notice of the same to the insurer . . . .  It
> is only upon compliance with these conditions that the insurer
> has agreed to so suspend the original stipulations in the policy.

Id. at 303-04 (emphasis added); see also 4 Couch on Ins. § 65:76.  In other

words, the mortgagee's responsibility to provide notice to the insurer was a

condition to the application of the standard mortgage clause, such that

failure to provide notice meant that "the mortgage clause agreement no

longer protected her while she so failed or neglected to comply with the

conditions of the same, and she held her insurance thereafter subject to the

conditions of the original policy, at least until she should comply with the

conditions of the mortgage clause agreement."  Id. at 304; see also Bank of

Ipswich v. Harding County Farmers' Mut. Fire & Lightning Ins. Co., 225

N.W. 721 (S.D. 1929); Mortgagee Affiliates Corp. v. Commercial Union Ins.

Co. of N.Y., 276 N.Y.S.2d 404, 404 (N.Y. App. Div. 1967) (stating that "the insured mortgagee is clothed with responsibilities as well as benefits").

The court finds that if Fin-Ag failed to provide notice, pay an absent premium, or provide proper proof of loss, then NAU's denial of coverage to O'Daniel would operate to similarly deny Fin-Ag's claim. But Fin-Ag's knowledge about a substantial change in risk, Fin-Ag's notice to NAU of this change, any demands by NAU that Fin-Ag pay a delinquent premium, and timely submission of Fin-Ag's proof of loss to NAU cannot be determined from the face of the pleadings. Thus, if there is coverage for Fin-Ag's loss under the contract in the event it fulfilled the above enumerated conditions, then NAU's motion to dismiss would be denied.

### 3. No coverage for conversion or embezzlement

The NAU policy explicitly states that it covers livestock listed on the declarations page. Docket 9-2, page 10. The general policy provides that, while coverage is permitted in the event of theft, "[h]owever, 'we' do not pay for loss: . . . by wrongful conversion or embezzlement." Id. at 16. As stated above, the Eighth Circuit examined this very provision, held that it was not ambiguous, and concluded that O'Daniel was not entitled to recovery for Midwest Feeder's conversion of his cattle. O'Daniel, 427 F.3d at 1060.

Two provisions of the loss payable clause are important as to whether this provision is controlling of Fin-Ag's claims. First, the loss payable clause

18

states that "[a]ll 'terms' of this policy apply to the mortgagee, secured party, or lender unless changed by this clause."  Docket 9-3, page 24.  Second, the loss payable clause of the policy states that a secured party's interest "is not covered for 'your' conversion, embezzlement, or secretion of encumbered property in 'your' possession, unless specifically insured against and premium paid for such."  Id.  The contract defines "you" as the insured.  Id. at 6.

Fin-Ag's argument is that the content of the loss payable clause discussing conversion and embezzlement obviates the earlier exclusion for conversion or embezzlement with regard to its claims.  Fin-Ag contends that while the general policy had an exclusion for conversion and embezzlement, the loss payable clause changed this exclusion by specifying that only conversion or embezzlement *by the insured* is excluded from its coverage. This consideration of conversion and embezzlement in the loss payable clause grants the mortgagee with greater protections under the policy because coverage would be provided for loss arising out of conversion or embezzlement committed by anyone except the insured, unless Fin-Ag paid an additional premium to cover O'Daniel's conversion or embezzlement.  In the alternative, asserts Fin-Ag, an ambiguity is created regarding the conversion and embezzlement exclusions, requiring an interpretation in favor of coverage.  Finally, Fin-Ag contends that failure to recognize a

19

change in the exclusions based on the loss payable clause would render the provision discussing "your conversion" "redundant and meaningless."

NAU argues that the plain language of the policy excludes from coverage embezzlement or conversion of the cattle, barring Fin-Ag from recovery under the policy. Regarding the loss payable clause, the conversion/embezzlement language present there does not alter the application of the general exclusion for conversion/embezzlement, states NAU. NAU also contends that even if the language is redundant, it is not ambiguous as a matter of law. Under the terms of the policy, NAU asserts, Fin-Ag is not entitled to recovery for its loss.

### a. The general policy exclusion for conversion or embezzlement applies to Fin-Ag

The court must determine whether any of the terms in the loss payable clause alter the general policy exclusions with regard to conversion or embezzlement of the animals. Although courts generally recognize that a standard mortgage clause creates an independent contract between the mortgagee and insurer,

> it is only for the limited purpose of providing that acts of the mortgagor cannot defeat the mortgagee's right to payment, and thus, it is not an entirely disconnected contract. It is instead a contract "engrafted upon the contract of insurance contained in the policy itself and is to be rendered certain and understood by reference to the policy itself." The standard mortgage clause thus does not nullify the terms of the original contract, but creates a new contract containing those provisions insurer made with insured personally.

Iowa Nat'l Mut. Ins. Co. of Cedar Rapid, Iowa v. Cent. Mort. & Investment Co. of Colorado Springs, 708 P.2d 480, 483 (Colo. Ct. App. 1985) (citations omitted).  To determine the terms of the contract between the mortgagee and the insurer, "reference must necessarily be had to both the mortgage clause and the policy of which it is made a part."  Travelers Ins. Co. v. Springfield Fire & Marine Ins. Co., 89 F.2d 757, 761 (8th Cir. 1937).

> To ascertain the [terms of the policy] resort must be had to the policy.  In other words, the policy fixes the quantity and quality of the insurance except in so far as it may be modified by the mortgage clause, and the general purpose of that clause is to make the insurance provided for in the policy payable to the mortgagee as its interest may appear.  Provisions of the policy which are in conflict with provisions of the mortgage clause or which that clause indicates were not intended to apply to the mortgagee would, of course, form no part of the contract between the mortgagee and the insurer.  Provisions of the policy which are clearly intended to condition the insurance granted by the insurer to both mortgagor and mortgagee would form a part of the contract of insurance with the mortgagee as well as with the mortgagor.

Id. (also stating that such a clause does not limit application of the entire policy to only the provisions "as are favorable to the mortgagee").  Another court said it this way:  "[W]hen there is an added writing, like a standard mortgagee clause, defining rights and obligations of a mortgagee, not all the provisions of the [] policy are thereby excluded from application to him [the mortgagee].  Only those which may be inconsistent, conflicting or superfluous may be so excluded."  Mortgage Affiliates Corp., 276 N.Y.S.2d at 404.  "After all,

the mortgagee clause is only engrafted on the [] policy which is still the primary controlling instrument." Id.

The court is unpersuaded by Fin-Ag's arguments that the terms of the loss payable clause addressing conversion and embezzlement cancel out the other references to conversion and embezzlement in the policy. The provisions in the standard mortgage clause are to be read in the context of the entire contract, and the conversion provision in the standard mortgage clause does not express an intention to replace the general policy exclusion for conversion or embezzlement. This is not a situation where the provisions are "inconsistent, conflicting or superfluous," because the policy can be read to exclude wrongful conversion or embezzlement in general as well as conversion or embezzlement or misappropriation of the cattle by the insured himself. See Mortgage Affiliates Corp., 276 N.Y.S.2d at 404. It is an unreasonable reading of the contract to state that the provision requiring the mortgagee to pay for additional coverage in order to insure against conversion or embezzlement by the mortgagor simultaneously removes the general exclusion covering conversion or embezzlement by any other party. The plain language of the contract states otherwise. Because the policy as a whole can be read to accommodate both provisions without contradiction, the court must give effect to both provisions.

### b. No ambiguity or redundancy exists

Fin-Ag next asserts that the provision which states that the mortgagee can insure against "'your' conversion, embezzlement, or secretion of encumbered property in 'your' possession," read with the general policy language regarding conversion and embezzlement, creates an ambiguity in the policy which must be read in favor of coverage. In the alternative, Fin-Ag contends that the provision in the standard mortgage clause is redundant and would render the remainder of the standard mortgage clause "meaningless."

As stated above, the court finds that the plain language of both pertinent provisions demonstrates that they are not ambiguous, nor are they redundant. The policy language providing coverage for theft but exempting wrongful conversion or embezzlement applies to parties outside of the insurance contract, while the conversion/embezzlement provision in the standard mortgage clause protects only the mortgagee, in the event of misdeeds by the mortgagor, and requires payment of an additional premium. No ambiguity exists which would require this court to do anything other than apply both provisions.

Furthermore, Fin-Ag is incorrect in stating that the alleged inconsistencies in the language render "meaningless" the remainder of the mortgage clause. As discussed above, the two provisions together exclude coverage in conversion and embezzlement situations, but permit a mortgagee to

secure additional insurance against the mortgagor's misappropriation, as long as it pays for it. This interpretation of the plain language of the contract does not jeopardize the clarity or enforceability of the remainder of the mortgage clause. See Biegler v. Am. Family Mut. Ins. Co., 621 N.W.2d 592, 598-99 (S.D. 2001). For these reasons, the court finds that the general exclusion for conversion and embezzlement applies to Fin-Ag's claims under the contract. This conclusion is not dispositive of Fin-Ag's breach of contract claim, however, because NAU may still be liable to Fin-Ag for nonconversion/embezzlement theft of the cattle or other loss of the cattle. As a result, the court will consider NAU's res judicata and collateral estoppel arguments.

### 4. O'Daniel's previous claims do not operate to bar Fin-Ag's breach of contract and bad faith claims

In its motion to dismiss, NAU asserts that the doctrines of res judicata and collateral estoppel preclude Fin-Ag's claims. NAU contends that with regard to Fin-Ag's claims under the insurance policy,[1] because "the specific res at issue has already been litigated" in O'Daniel v. NAU, and because Fin-Ag waited six years while O'Daniel "[bore] the weight and expense" of litigation, Fin-Ag should be barred from now litigating the question of insurance coverage. Docket 17, pages 8-10. In response, Fin-Ag argues that the judgment in O'Daniel v. NAU does not bind Fin-Ag, a nonparty to that lawsuit.

---

[1] The application of these doctrines to Fin-Ag's other tort claims is discussed *infra*.

A review of the prior litigation is required. O'Daniel first filed suit against NAU on May 21, 2003. See CV 03-5045-AWB. O'Daniel's complaint alleged that the insurance policy provided coverage for theft of his cattle. Upon cross motions for summary judgment, the court denied NAU's motion for summary judgment, finding that the policy's provisions relating to theft and conversion were ambiguous and unenforceable, requiring judgment for O'Daniel. NAU appealed, and the Eighth Circuit reversed, finding as a matter of law that the policy provisions were not ambiguous and were enforceable, and that the undisputed facts of the case demonstrated that conversion, not theft, caused O'Daniel's loss. O'Daniel v. NAU, 427 F.3d 1058, 1060 (8th Cir. 2005). Consequently, the Eighth Circuit found that "the loss was not covered in the policy" and ordered the district court to enter summary judgment in favor of NAU. Id. Neither party petitioned for certiorari to the United States Supreme Court. As a result, this is a final judgment.

On October 11, 2005, O'Daniel filed a second lawsuit naming NAU as a defendant, along with Judy Roosa and Stroud NA. See CV 05-5089-LLP. NAU moved for summary judgment, asserting that O'Daniel's claims of breach of contract and bad faith were barred in light of the Eighth Circuit's opinion in O'Daniel v. NAU. This court entered summary judgment in favor of NAU on the breach of contract and bad faith claims, but denied NAU's motion with regard to the remaining tort claims. In a second motion for summary judgment filed

by NAU on the remaining claims, the court entered summary judgment in favor of NAU, finding that the undisputed facts of the case demonstrated that NAU could not be liable for the misdeeds of Roosa because she was not NAU's agent for the purposes of this policy. Thus, summary judgment was entered in favor of NAU on O'Daniel's claims of fraud and deceit, negligent misrepresentation, and negligent procurement. This is not a final judgment because the time to appeal to the Eighth Circuit Court of Appeals has not run. <u>See</u> Rule 54(b).

The question at hand is what effect this prior litigation has on Fin-Ag, who was not a party to any of the prior litigation involving O'Daniel and NAU. While the general rule is that "a litigant is not bound by a judgment to which [he] was not a party," the doctrines of collateral estoppel and res judicata may prevent litigation of previously-litigated claims and issues. <u>Taylor v. Sturgell</u>, 128 S. Ct. 2161, 2175, 171 L. Ed. 2d 155 (2008). Collateral estoppel, also known as issue preclusion, bars litigation regarding an issue which has previously been litigated. 18 Wright, Miller & Cooper, <u>Federal Practice and Procedure</u> § 4416; <u>Merchants State Bank v. Light</u>, 458 N.W.2d 792, 793-94 (S.D. 1990). In contrast, res judicata, also known as claim preclusion, is broader than issue preclusion and "precludes litigation of an issue actually litigated *and* issues which could have been properly raised and determined in a prior action." <u>Merchants State Bank</u>, 458 N.W.2d at 794.

### a.    Issue preclusion does not bar Fin-Ag's claims

Under the doctrine of issue preclusion, claims are barred when they involve "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment," even if the issue recurs in the context of a claim with different parties.  Taylor, 128 S. Ct. at 2171 (citing New Hampshire v. Maine, 532 U.S. 742, 748, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)); see also Wright, Miller & Cooper 18A Federal Practice and Procedure § 4448.  The United States Supreme Court in Taylor discussed six exceptions to the general rule against nonparty issue preclusion, four of which do not apply here.  Taylor, 238 S. Ct. at 2172.

The first relevant exception provides that nonparty preclusion "may be justified based on a variety of pre-existing 'substantive legal relationship[s]' between the person to be bound and a party to the judgment."  Id. (citations omitted).  Such relationships "include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor."  Id.  As to whether a mortgagor-mortgagee relationship would constitute the required "substantive legal relationship," authority holds that no such relationship is formed that would justify holding one party to the judgment of another.  See Chase Nat. Bank v. City of Norwalk, 291 U.S. 431, 438, 54 S. Ct. 475, 78 L. Ed. 894 (1934) (holding that "a decree against a mortgagor with respect to property does not bind a mortgagee whose interest was acquired

27

before the commencement of the suit, unless he was made a party to the proceedings"); Lambert Inc. v. Starbrand Sales Corp., 422 F.2d 621, 624 (7th Cir. 1970); Estate of Brown v. Bank of Piedmont, 763 S.W.2d 719, 723-24 (Mo. App. SD. 1989); see also Restatement (Second) Judgments § 54 (1982) (stating that "when two or more persons have concurrent ownership interests in property, a judgment for or against one of them concerning his interest does not have effects under the rules of res judicata [or issue preclusion] on another such owner"); 18A Wright, Miller & Cooper, Federal Practice & Procedure § 4461 n.2; id. § 4448 (stating that "[p]ersons holding concurrent interests in the same property . . . ordinarily do not preclude each other"); 50 C.J.S. Judgments § 1148 (1982).

Based on this authority, the court finds that Fin-Ag and O'Daniel did not have a substantive legal relationship of the sort that would bind both parties. Although Fin-Ag and O'Daniel are contractually related through the mortgage and hold concurrent interests in the missing cattle, the mere existence of a mortgage is insufficient to form the substantive legal relationship resulting in a judgment against one party precluding the claims of another party.

The second exception to nonparty preclusion which may apply provides that in "certain limited circumstances, a nonparty may be bound by a judgment because [it] was 'adequately represented by someone with the same interests who [wa]s a party' to the suit." Taylor, 128 S. Ct. at 2172-73 (citing

Richards v. Jefferson County, 517 U.S. 793, 797, 116 S. Ct. 1761, 135 L. Ed. 2d 76 (1996)) (stating that such suits may include "properly conducted class actions, and suits brought by trustees, guardians, and other fiduciaries"). As stated above, mortgagees are generally not bound by a judgment involving the mortgagor. Regarding the qualitative aspect of the representation,

> [a] party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) the interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty. In addition, adequate representation sometimes requires (3) notice of the original suit to the persons alleged to have been represented.

Id. at 2176 (citations omitted); see also id. at 2178-79 (finding no issue preclusion because the record did not demonstrate that the party understood he was suing on Taylor's behalf, that Taylor knew of the earlier suit, or that the court took special care to protect Taylor's interests); Richards, 517 U.S. at 801 (stating that for a judgment to have a binding effect on absent parties, the prior proceeding "would at least have to be 'so devised and applied as to insure that those present are of the same class as those absent and that the litigation is so conducted as to insure the full and fair consideration of the common issue.")

Fin-Ag asserts that it cannot be bound by O'Daniel's conduct in its suits against NAU because "O'Daniel did not adequately represent Fin-Ag's interests in establishing that conversion and embezzlement did not occur." Docket 16, page 5. Here, however, Fin-Ag and O'Daniel did not have the "same interests"

under the insurance policy. The existence of a standard mortgage clause confers on Fin-Ag rights under the contract that are separate and distinct from O'Daniel. Even if the court were to find that O'Daniel's interests in this matter were aligned with Fin-Ag's interests, there is no indication in the record that O'Daniel understood himself to be acting as Fin-Ag's representative or that the original court took any steps to protect Fin-Ag's interests.

For these reasons, the court finds that the judgment on O'Daniel's earlier actions against NAU does not preclude Fin-Ag from contesting whether the cattle were in fact converted or embezzled and as a result whether the conversion exclusion in the policy should be applied to his loss as a mortgagee.

### b. Res judicata does not bar Fin-Ag's claims

Under the doctrine of res judicata, or claim preclusion, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." Costner v. URS Consultants, Inc., 153 F.3d 667, 673 (8th Cir. 1998).

> A claim will be held to be precluded by a prior lawsuit when (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action.

Id.

The court concludes that resolution of O'Daniel's claims against NAU does not bind Fin-Ag, a nonparty to those suits. First, the requirement that

both suits contain "the same parties (or those in privity with them")" is not met. The privity element between the parties requires that the court "treat all those whose interests are involved in the litigation and who conduct and control the action or defense as real parties, and hold them concluded by any judgment that may be rendered." Merchants State Bank, 458 N.W.2d at 794. The record does not reflect that Fin-Ag conducted or controlled O'Daniel's litigation as a real party, and NAU has presented no such argument that Fin-Ag was in any way connected to O'Daniel's earlier lawsuits. Second, the requirement that "both suits [be] based on the same claims or causes of action" does not apply to Fin-Ag's actions under the policy. As discussed above, Fin-Ag has separate rights under the contract as a mortgagee that were not litigated in the prior actions. Furthermore, Fin-Ag seeks to dispute whether the cattle were converted or were stolen, a factual dispute that the Eighth Circuit resolved based on the facts before it, but which Fin-Ag challenges in its complaint here. Thus, the court does not believe that "the wrong sought to be redressed is the same in both actions." Merchants State Bank, 458 N.W.2d at 794.

For these reasons, the court finds that Fin-Ag's claims under the insurance contract are not barred by the previous judgments in NAU's favor in actions brought by O'Daniel.

### 5. Questions of fact exist regarding coverage that prevent dismissal

To summarize, the court has determined that Fin-Ag may be entitled to recover under the policy if: (1) Fin-Ag can establish that its loss was the result of theft, not conversion or embezzlement, and (2) Fin-Ag can demonstrate that it fulfilled its conditions in the standard mortgage clause. Furthermore, because the standard mortgage clause may provide coverage for O'Daniel's conversion or embezzlement if Fin-Ag paid additional premiums, Fin-Ag may have a claim under the terms of the policy for such loss. Thus, questions of fact exist regarding the characterization of O'Daniel's loss of cattle while housed at Midwest Feeders; whether Fin-Ag provided proper notice, payment, and proof of loss under the contract; and possible additional premiums paid by and additional coverage owed to Fin-Ag. For these reasons, NAU's motion to dismiss is denied as to actions under the policy, because NAU has not demonstrated that Fin-Ag has failed to state a claim on which relief can be granted.

### B. The remaining tort claims are not barred by previous litigation

Finally, NAU asserts that Fin-Ag's tort claims are precluded by the prior judicial determinations between O'Daniel and Fin-Ag. These claims include fraud and misrepresentation, negligent misrepresentation, deceit, negligent procurement, equitable estoppel, and revision/reformation of the contract. In

O'Daniel's earlier actions against NAU, summary judgment was awarded to NAU on claims of fraud and deceit, negligent misrepresentation, and negligent procurement. CV05-5089-LLP, Docket 82; <u>see also</u> Docket 41 (amended complaint). The court examined whether Roosa, the insurance broker, was an agent of NAU such that her tortious conduct may be imputed to the insurance company and ultimately concluded that the undisputed facts demonstrate that no agency relationship existed between Roosa and NAU. CV05-5089-LLP, Docket 82, page 21. The court entered judgment in NAU's favor. Docket 83.

For the reasons stated above, the court concludes that Fin-Ag's claims are not precluded based on the resolution of similar claims in O'Daniel's suit, to which Fin-Ag was not a party. Because NAU has not demonstrated that Fin-Ag cannot state a claim upon which relief may be granted regarding these claims, NAU's motion to dismiss is denied.

Based on the foregoing, it is hereby

ORDERED that defendant's motion to dismiss (Docket 9) is denied.

Dated June 26, 2009.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE